IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HILLMEN, INCORPORATED<br>*Plaintiff*<br><br>v.<br><br>LUKOIL NORTH AMERICA, LLC<br>*Defendant* | : CIVIL ACTION<br>:<br>: NO. 13-4239<br>:<br>:<br>:<br>:<br>: |

NITZA I. QUIÑONES ALEJANDRO, J.                                   November 22, 2013

## MEMORANDUM OPINION and ORDER

**INTRODUCTION**

On July 23, 2013, Hillmen, Inc., ("Plaintiff" or "Hillmen") filed a complaint pursuant to the Petroleum Marketing Practices Act (the "PMPA"),[1] against Lukoil North America, LLC, ("Defendant" or "Lukoil") claiming that its petroleum marketing franchise agreement was wrongfully terminated. At the same time, Plaintiff filed a motion for a preliminary injunction [ECF 2], to which Defendant responded on August 22, 2013. [ECF 9].[2]

On October 17, 2013, an evidentiary hearing on the preliminary injunction motion was held.[3] Testimony and evidence was introduced through Zahid Khan, Plaintiff's principal, and through Jake Naggy, Defendant's Retail Operations and Regional Sales Manager. Following the hearing, the parties submitted supplemental briefs. [ECF 18 and 19].

For the reasons stated herein, Plaintiff's motion for a preliminary injunction is denied.

---

[1] 15 U.S.C. § 2801, *et seq.*

[2] After Plaintiff filed its motion for a preliminary injunction, Plaintiff agreed to a 10 day extension for Defendant to respond to the motion. [ECF 7].

[3] The evidentiary hearing was initially scheduled for September 19, 2013; however, at Plaintiff's request it was rescheduled for October 17, 2013. [ECF 13].

1

# FACTS

Plaintiff is a Pennsylvania corporation owned and operated by its principal and president, Zahid Khan. Defendant is alleged to be a corporation with its principal place of business in New Jersey and engaged in the business of distributing LUKOIL brand motor fuel in Pennsylvania, New York and New Jersey.

Plaintiff operated a gas station and convenience store located at 9100 Frankford Avenue, Philadelphia, Pennsylvania, (the "Station") under the "Lukoil" trade name. Plaintiff purchased the Station from a former franchisee in December 2006 and then entered into a three-year franchise agreement (the "Franchise Agreement") with Defendant in February 2007. The Franchise Agreement was renewed on February 1, 2010 and, again, on February 1, 2013. Under the Franchise Agreement Plaintiff, *inter alia,* leased the premises from Defendant, paid rent, and agreed to purchase Defendant's motor fuel and resell it to consumers under the Lukoil trademark.

Evidence submitted with the parties' filings and offered during the preliminary injunction hearing established that beginning in March 2007, and continuing until April 3, 2013, there were numerous occasions when Defendant sent written notices to Plaintiff that it was in breach of the Franchise Agreement; *to wit*:

> By letter dated March 30, 2007, Plaintiff was advised that it was in default of the Franchise Agreement for failing to pay timely for the delivered motor fuel. Though Plaintiff eventually paid the then outstanding invoices, Defendant advised Plaintiff that future defaults could result in the revocation of Plaintiff's credit and being placed on "PRE-PAID status."[4] Similar default notices for failure to timely pay for motor fuel were sent on September 14, 2007, August 5, 2008, August 20, 2008, and December 9, 2008.[5] By letter dated August 5, 2008, Defendant notified Plaintiff that the Station had been allowed to run out of its motor fuel inventory

---

[4] PRE-PAID status required that Plaintiff pay cash before the delivery of any motor fuel.

[5] During the hearing, Mr. Khan testified that sometime in 2008, an accounting error by Defendant was eventually reconciled in Plaintiff's favor.

and issued a demand to Plaintiff to immediately purchase and market the Lukoil branded motor fuel. Defendant advised Plaintiff that its failure to comply with this directive would constitute a "substantial" violation of the Franchise Agreement. Defendant also reminded Plaintiff that the PMPA allowed Defendant to terminate the Franchise Agreement should Plaintiff fail to sell Lukoil motor fuel for seven consecutive days.[6] By letter dated September 9, 2008, Defendant advised Plaintiff that it was terminating the Franchise Agreement because of Plaintiff's continued failure to pay for the motor fuel.[7] Apparently, the franchise Agreement was not terminated. By letter dated October 26, 2012, Defendant advised Plaintiff that it would not renew the Franchise Agreement set to expire on January 31, 2013, because Plaintiff had refused to accept a number of changes to the agreement Defendant deemed necessary and reasonable for its operations. Notwithstanding the initial disagreement over the proposed modified terms, the parties eventually came to an understanding and executed a new franchise agreement with an effective date of February 1, 2013.

Critical to this motion for preliminary injunction are the events related to the delivery of motor fuel on Tuesday, February 19, 2013, around 11:50 P.M. Mr. Khan testified that he had expected that the delivery would be made on the morning of Wednesday, February 20, 2013, but admitted that it was, in fact, delivered *and* accepted late Tuesday evening. Mr. Khan further testified that he had inquired of Defendant when Plaintiff's account would be debited for this delivery and, allegedly, was told that the account would be debited the following Monday, February 25, 2013. Plaintiff's account, however, was debited on the morning of Friday, February 22, 2013, which caused the payment to "bounce" for lack of insufficient funds.

Mr. Khan acknowledged that under the scheduled credit payment plan with Defendant, Plaintiff was required to pay for delivered fuel by an electronic fund transaction ("EFT") three "business days" after a delivery was made. As to this particular delivery, Mr. Khan testified that he was under the impression that since the fuel was delivered during the late evening hours of Tuesday, February 19, 2013, the payment did not need to be made until the following Monday,

---

[6] Defendant sent Plaintiff similar notices on September 4, 2008, and on December 9, 2008.

[7] Although not addressed in the parties' briefs, the parties appeared to have resolved the dispute and continued their franchise relationship.

3

February 25, 2013. On this issue, Defendant refuted Mr. Khan's testimony with Jake Naggy, its Manager of Retail Operations. He testified that he is the person responsible for implementing Defendant's EFT policy, which had been reiterated to all franchisees by notice dated October 16, 2012; *to wit*:

> Please be reminded that LUKOIL North America's payment terms for dealers who have been extended credit are that the EFT will occur on the third business day following the date of Bill of Lading (BOL). The date of BOL is the date that the load was lifted at the terminal. Please refer to www.lnallc.com for all EFT draft dates, and see below example:

| BOL Day | EFT Day |
|---|---|
| Monday | Thursday |
| Tuesday | Friday |
| Wednesday | Monday |
| Thursday | Tuesday |
| Friday | Wednesday |
| Saturday | Wednesday |
| Sunday | Wednesday |

> Note: Bank holidays will not be counted as business days.[8]

Mr. Naggy testified that in accordance with this schedule, for example, any fuel delivered on Tuesday must be paid for by EFT on Friday. He further testified that a business day under the policy is any 24-hour day, other than a weekend or holiday, not the "9-5 business day" espoused by Mr. Khan. It is noted, that neither the content of the letter nor the illustrative chart draws any distinction for fuel deliveries after 5:00 P.M. (or any particular time).

---

[8]Exhibit D-4.

Mr. Naggy's testimony was corroborated by other documentation submitted during the hearing. In particular, Defendant offered a collection of bills of laden and invoices (Exhibit D-3) corresponding to fuel deliveries made to Plaintiff between December 21, 2012, and February 23, 2013. Each of the invoices, including one corresponding to the February 19, 2013 fuel delivery, shows a "Due Date," three calendar days after the fuel delivery date, not counting the weekends or holidays, even when the delivery was made after 5:00 P.M., *i.e.*, what Plaintiff described as "after business" hours. For example, this particular exhibit shows that Plaintiff received a delivery of fuel on Tuesday, February 5, 2013, sometime after 9:49 P.M., and had a "Due Date" of Friday, February 8, 2013. (*See* Exhibit D-3 at pp. 5-6).

Plaintiff also introduced evidence that supported Mr. Naggy's testimony. Specifically, Plaintiff introduced a document which listed EFT transactions from Plaintiff's account originating between January 9, 2013, and April 15, 2013 (Exhibit P-3). This document shows that Plaintiff's EFT account was charged for the delivery made "after business hours" on Tuesday, February 5, 2013, on Friday, February 8, 2013, three days later, similarly to the transaction involving the Tuesday, February 19, 2013 delivery.[9]

As the result of his nonpayment for the February 19, 201 delivery, Plaintiff was placed on "prepaid" status on Monday, February 24, 2013. This status required Plaintiff to pay for future fuel *prior to* its delivery. Notably, under the terms of the Franchise Agreement, Plaintiff was required to pay for fuel "prior to delivery," unless Defendant, "in its sole discretion," offered and agreed to other credit terms. *See* Franchise Agreement §§ 2.3 and 2.4. The Franchise Agreement also permitted Defendant to "revoke credit, at any time." *Id.* at §2.4(a).

---

[9] Upon consideration of the evidence presented, this Court opines that Plaintiff was required to pay for fuel deliveries within three days of the delivery, regardless of whether the delivery was made "after business hours."

5

At the hearing, Mr. Kahn conceded that Plaintiff did not pay for the fuel on Friday, February 22, 2013. He also admitted the invoice was not paid on the date when Plaintiff deemed it due (on Monday). Plaintiff further conceded that as of the date of the hearing, the money owed for the February 19, 2013 motor fuel delivery had still not been paid, nor had it paid for the motor fuel delivered on Saturday, February 22, 2013.[10] Although Mr. Khan disputes the amount Defendant says Plaintiff owes it, Mr. Khan admitted that Plaintiff owes Defendant an undetermined debt.

By two letters dated March 6, 2013, Plaintiff was notified it had a past due and unpaid balance of $71,008.21, and had failed to maintain an adequate inventory of motor fuel at the premises. Defendant demanded that Plaintiff immediately recommence its purchase of motor fuel from Defendant and market the fuel to the motoring public. These letters again reminded Plaintiff that the PMPA permits the termination of the Franchise Agreement if it failed to sell motor fuel at the Station for seven consecutive days.[11]

By letter dated April 3, 2013, Defendant notified Plaintiff of the termination of the Franchise Agreement (the "Termination Letter"), explaining that: (1) Plaintiff failed "to sell any gasoline at the [Premises] in the period from at least March 11, 2013 to present," and (2) Plaintiff "abandoned the franchise, the franchise relationship and the Franchise Agreement." The Termination Letter also set forth the following purported breaches by Plaintiff:

(i) intentionally not operated the Marketing Premises to be employed under the franchise in connection with sale or distribution of motor fuel, for a period of seven (7) consecutive days, i.e., in the period at least March 11, 2013 to present, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time:

---

[10]During the hearing, Mr. Khan admitted that Plaintiff owed at least $40,000 for the two February fuel deliveries, after taking into consideration application of some or all of Plaintiff's $45,000 security deposit.

[11] By letter dated March 26, 2013, Defendant notified Plaintiff of additional defaults of the Franchise Agreement.

(ii) intentionally not operated the Marketing Premises to be employed under the franchise during operating hours required by the PMPA Franchise Agreement, and intentionally failed to keep the motor fuels business open and in normal operation for those periods:

(iii) failed to use good faith and best efforts to maximize the sale of Products at the Marketing Premises as required by the PMPA Franchise Agreement; and

(iv) failed to maintain an adequate inventory of motor fuel to serve the needs of the motoring public at the Marketing Premises.

Defendant concluded that these breaches required the termination of the Franchise Agreement effective on April 9, 2013.

Plaintiff does not dispute that it failed to purchase motor fuel from Defendant, or that it remained closed without selling motor fuel for more than seven consecutive days. Rather Mr. Khan admitted that the Station ran out of fuel and had not sold any fuel since March 2013. Mr. Khan further admitted that as of the date of the hearing, Plaintiff had still not paid for the two fuel deliveries previously described, had not paid any rent for the premises since February 2013, and currently owes at least $50,000 in rent. As justification for these defaults, Mr. Kahn alleges that Plaintiff's inability to meet these financial obligations was caused by Defendant's wrongful conduct of charging for the delivered fuel before the scheduled date, which resulted in Plaintiff being placed on "prepay" status, leading to its inability to pay in advance for fuel deliveries.

**STANDARD OF REVIEW**

The PMPA was enacted in 1978 to protect a franchisee's reasonable expectation of continuing a franchise relationship while at the same time insuring that distributors have adequate flexibility to respond to changing market conditions and consumer preferences. *Patel v. Sun Company, Inc.*, 63 F.3d. 248 (3d Cir. 1995). The PMPA was intended to mitigate the

perceived disparity in bargaining power between franchisors and franchisees by protecting the latter from arbitrary or discriminatory terminations or non-renewals. *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 587 (3d Cir. 1989); *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3d Cir. 1987). The PMPA attempts to alter this imbalance by 1) regulating the grounds and conditions for which distributors may terminate or fail to renew a franchise and 2) by creating an exclusive cause of action for aggrieved franchisees to challenge such actions. *See* 15 U.S.C. §§ 2802(b)(1) and 2805; *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 294 (3d Cir. 2008). The PMPA's primary goal is to provide protection to the franchisee. *Rodgers v. Sun Refining and Marketing Company*, 772 F.2d 1154, 1158 (3d Cir. 1985). For "legitimate needs," however, a franchisor can terminate the franchise based upon one of the enumerated grounds set forth in the statute. *Id.* (quoting *Sun Refining and Marketing Company v. Rago,* 741 F.2d 670, 673 (3d Cir. 1984)).

The PMPA also authorizes courts, where appropriate, to issue a preliminary injunction in order to preserve the franchise relationship while a termination dispute is litigated. It provides a lower threshold for obtaining a preliminary objection than ordinarily required under the Federal Rules of Civil Procedure. *Brownstein v. Arco Petroleum Products, Co.*, 604 F. Supp.2d 312, 314 (E.D. Pa. 1985). Under the PMPA, a court must grant a preliminary injunction if the franchisee shows that: (1) the franchise of which it is a party has been terminated; (2) there "exist serious questions going to the merits to make such question a fair ground for litigation;" and (3) the hardship a preliminary injunction would place on the franchisor "will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." 15 U.S.C. § 2805(b)(1)-(2).

The PMPA does not define what constitutes a "serious question . . .that. . .is a fair ground for litigation." However, courts have generally interpreted this element as requiring a plaintiff to

8

show that it has "a reasonable chance of success" on the merits but "something far less than . . . 'probability or likelihood.'" *Saad v. Shell Oil Co.*, 460 F. Supp. 114 (E.D. Mich. 1978); *see also Nassau Boulevard Shell Service Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 363 (2d Cir. 1989); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1217 (7th Cir. 1984).

Section 2805(b)(4) provides that the court "need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced (A) more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee . . . or (C) more than 30 days after the date on which the termination of such franchise . . . takes effect if less than 90 days notification was provided pursuant to section 2804(b)(1) of this title." 15 U.S.C. § 2805(b)(4)(A) and (B). Pursuant to this provision, courts have declined to grant a franchisee injunctive relief where it commenced the action after the expiration of the applicable deadline. *See e.g. Kesselman v. Gulf Oil Corp.*, 479 F. Supp. 800, 804 (E.D. Pa. 1979), *aff'd*, 624 F.2d 1090 (3d Cir. 1980); *Cantrell v. Exxon Co., U.S.A.*, 574 F. Supp. 313, 318 (M.D. Tenn. 1983); *Walters v. Chevron U.S.A., Inc.*, 476 F. Supp. 353, 357 (N.D. Ga. 1979), *aff'd*, 615 F.2d 1135 (5th Cir. 1980); *Daras v. Star Enterprise*, 1992 WL 345664, *3 (D. Md. Nov. 12, 1992).

The PMPA provides limited grounds upon which a franchisor can terminate a franchise agreement. *Sun Refining and Marketing Co. v. Rago*, 741 F.2d 670, 673 (3d Cir. 198); 15 U.S.C. §2802(b)(2). Section 2802(b)(2)(A) provides that a franchisor may terminate a franchise relationship if there is a "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." The Act does not define "reasonable" or "material significance." Courts have interpreted these terms, however, by keeping with the common and ordinary use and meanings of these terms;

9

such as, contractual terms that are vital to the franchise agreement[12] or when the franchisee failed to comply with a franchise provision that is both conscionable and of real importance or great consequence to the franchise relationship.[13] The Third Circuit's "materiality" test inquires whether the franchise agreement provision is a non-technical requirement and is a "significant substantive requirement relating to the way the franchisee must run his business." *O'Shea*, 886 F.2d at 595 n. 11. Termination under this subsection does not require that the franchisor provide the franchisee the opportunity to cure. *Id.* at 595.

The franchise can also be terminated for a "failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise if the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions." 15 U.S.C. § 2802(b)(2)(B). Termination under this provision is permissible without consideration as to the reasonableness of the contractual provision so long as the franchisee is given an opportunity to comply. *O'Shea*, 886 F.2d at 595.

Termination is also permitted if there is an "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(C). An "event" within the meaning of this subsection expressly includes, *inter alia*, "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled" and "failure by the franchisee to operate the marketing premises for 7 consecutive days." § 2802(c)(8) and (9). In addition, the Third Circuit has concluded that a franchisee's failure to have

---

[12] *NSY, Inc. v. Sunoco, Inc.*, 218 F.Supp. 2d 708 (E.D. Pa. 2002) (citing *DiNapoli v. Exxon Corp.*, 549 F. Supp 449 (D.N.J. 1982)).

[13] *Id.* (citing *Doebereiner v. Sohio Oil Co.*, 880 F.2d 329 (11th Cir. 1989)).