**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **HILLMEN, INCORPORATED** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 13-4239** |
| **v.** | : | |
| | : | |
| **LUKOIL NORTH AMERICA, LLC** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                    JUNE 26, 2015

# MEMORANDUM OPINION

## INTRODUCTION

Before this Court is a motion for summary judgment filed by Lukoil North America, LLC, ("Defendant" or "Lukoil") pursuant to Federal Rule of Civil Procedure ("Rule") 56, which seeks the dismissal of the claims asserted against it by Hillmen, Incorporated, ("Plaintiff" or "Hillmen") for violating the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. §2801 *et seq.*, Pennsylvania's Uniform Commercial Code (the "UCC"), 13 Pa. C.S.A. §2305, and other state common law claims. The motion also seeks judgment in favor of Defendant against Plaintiff on its counterclaim for breach of contract. [ECF 47]. Plaintiff filed a response in opposition, [ECF 48], and Defendant filed a reply. [ECF 49]. The issues in the motion have been fully briefed and are ripe for disposition. For the reasons stated herein, this motion is granted.


## FACTUAL AND PROCEDURAL BACKGROUND

On July 23, 2013, Hillmen filed a complaint against Lukoil claiming that their petroleum marketing franchise agreement was wrongfully terminated in violation of the PMPA[1] and §2305

---

[1]      15 U.S.C. § 2801 *et seq.*

of the UCC, that Lukoil breached their franchise agreement, and that Lukoil committed fraud. [ECF 1]. On the same date, Plaintiff filed a motion for a preliminary injunction. [ECF 2]. On August 22, 2013, Defendant responded to the motion for a preliminary injunction. [ECF 9].

An evidentiary hearing on the preliminary injunction motion was held on October 17, 2013. Zahid Khan, Plaintiff's Principal, and Jake Naggy, Defendant's Retail Operations and Regional Sales Manager, were the sole testifying witnesses during the two-day hearing. At the conclusion of the hearing, a ruling was held in abeyance pending the submission of the parties' supplemental briefs. [ECF 18 and 19]. By Memorandum Opinion and Order dated November 22, 2013, this Court denied Hillmen's motion for a preliminary injunction. [ECF 23].

Thereafter, discovery ensued and was completed. On January 29, 2015, Defendant filed the underlying motion for summary judgment. As will be more fully discussed below, in opposing Defendant's motion, Plaintiff provides sparse citation to the factual record, despite its obligation to meet its own summary judgment burden under Rule 56. Notwithstanding Plaintiff's failure, the following is a summary of the relevant facts and evidence, viewed in the light most favorable to Plaintiff:[2]

Defendant is a corporation with its principal place of business in New Jersey, engaged in the business of distributing Lukoil brand motor fuel in Pennsylvania, New York and New Jersey. (Comp. ¶3). Plaintiff is a Pennsylvania corporation owned and operated by its Principal and

---

[2]    For purposes of Defendant's motion for summary judgment, this Court construes the facts and evidence in the light most favorable to the non-movant, Plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Here, these facts are drawn from Plaintiff's complaint, the exhibits attached to the parties' various filings, and the evidence submitted during the October 17, 2013 hearing on Plaintiff's motion for a preliminary injunction. Plaintiff provides very little by way of factual support in its opposition to Defendant's motion for summary judgment. Inexplicably, Plaintiff fails to even cite to any of the evidence submitted by either party during the hearing on Plaintiff's motion for a preliminary injunction. Notwithstanding Plaintiff's failure in this regard, this Court has considered said evidence in the light most favorable to Plaintiff when considering Defendant's underlying motion for summary judgment.

President, Zahid Khan. (*Id.* at ¶2; 10/17/13 Hearing Transcript ("Hrg. Tr."), p. 8). Plaintiff operated a gas station and convenience store located at 9100 Frankford Avenue, Philadelphia, Pennsylvania, ("Station") under the "Lukoil" trade name. (Comp. at ¶2). Plaintiff acquired the business from a former franchisee in December 2006, and in February 2007, entered into a three-year franchise agreement (the "Franchise Agreement") with Defendant. (*Id.* at ¶¶2, 5). This Franchise Agreement was renewed on February 1, 2010, and on February 1, 2013. (*Id.* at ¶5). Under the Franchise Agreement, Plaintiff, *inter alia,* leased the marketing premises or the Station from Defendant, paid rent, and agreed to purchase Defendant's motor fuel and resell it to consumers under the Lukoil trademark. (ECF 47, Ex. B, Franchise Agreement).

Evidence submitted with the parties' filings and offered during the preliminary injunction hearing established that beginning in March 2007, and continuing until April 3, 2013, Defendant on numerous occasions sent Plaintiff written notice advising of Plaintiff's breach of the Franchise Agreement; *to wit*:

> By letter dated March 30, 2007, Plaintiff was advised that it was in default of the Franchise Agreement for failing to timely pay for the delivered motor fuel. (*See* ECF 9-2, Ex. A). Though Plaintiff eventually paid the then outstanding invoices, Defendant advised Plaintiff that future defaults could result in the revocation of Plaintiff's credit and being placed on "PRE-PAID status."[3] (*Id.*). Similar default notices for failure to timely pay for motor fuel were sent on September 14, 2007, August 5, 2008, August 20, 2008, and December 9, 2008.[4] (*Id.*). By letter dated August 5, 2008, Defendant notified Plaintiff that the Station had been allowed to run out of its motor fuel inventory and issued a demand to Plaintiff to immediately purchase and market the Lukoil branded motor fuel. (*Id.*). Defendant advised Plaintiff that its failure to comply with this directive would constitute a "substantial" violation of the Franchise Agreement. (*Id.*). Defendant also reminded Plaintiff that the PMPA allowed Defendant to terminate the Franchise Agreement should Plaintiff fail to sell Lukoil motor fuel for seven

---

[3] PRE-PAID status required that Plaintiff pay cash before the delivery of any motor fuel. (Hrg. Tr. p. 39).

[4] During the hearing, Mr. Khan testified that sometime in 2008, an accounting error by Defendant was eventually reconciled in Plaintiff's favor.

consecutive days.[5] (*Id.*). By letter dated September 9, 2008, Defendant advised Plaintiff that it was terminating the Franchise Agreement because of Plaintiff's continued failure to pay for the motor fuel. (*Id.*). Apparently, the Franchise Agreement was not terminated. By letter dated October 26, 2012, Defendant advised Plaintiff that it would not renew the Franchise Agreement set to expire on January 31, 2013, because Plaintiff had refused to accept a number of changes to the agreement Defendant deemed necessary and reasonable for its operations. (*Id.*). Notwithstanding the initial disagreement over the proposed modified terms, the parties eventually came to an understanding and executed a new franchise agreement with an effective date of February 1, 2013. (*See* ECF 47, Ex. B, Franchise Agreement).

Critical to the claims asserted in this action are the events related to the delivery of motor fuel on Tuesday, February 19, 2013, around 11:50 P.M.[6] Mr. Khan testified that he had expected that the delivery would be made on the morning of Wednesday, February 20, 2013, but admitted that it was, in fact, delivered *and* accepted late Tuesday evening. (Hrg. Tr. at pp. 34-36). Mr. Khan further testified that he had inquired of Defendant when Plaintiff's account would be debited for this delivery and, allegedly, was told that the account would be debited the following Monday, February 25, 2013. (*Id.* at pp. 36-37). The account, however, was debited on the morning of Friday, February 22, 2013, which caused Plaintiff's payment to "bounce" for lack of sufficient funds. (*Id.*).

Mr. Khan acknowledged that under the scheduled credit payment plan with Defendant, Plaintiff was required to pay for delivered fuel by an electronic fund transaction ("EFT") three "business days" after the delivery was made. (Hrg. Tr. at p. 27). However, as to this particular delivery, Mr. Khan testified that he was under the impression that since the fuel was delivered during the late evening hours of Tuesday, February 19, 2013, the payment would not need to be made until Monday, February 25, 2013. (*Id.* at pp. 34-37). Defendant, however, disputed

---

[5]     Defendant sent Plaintiff similar notices on September 4, 2008, and on December 9, 2008. (*Id.*).

[6]     Inexplicably, Plaintiff does not cite any of the evidence submitted by the parties during the hearing on Plaintiff's motion for a preliminary injunction. To fully address the legal deficiencies of Plaintiff's claims, this Court has considered this evidence in the light most favorable to Plaintiff.

Plaintiff's impression with the testimony of Jake Naggy, its Manager of Retail Operations. (*Id.* at p. 127). Mr. Naggy testified that he was the person responsible for drafting and implementing Defendant's EFT policy, (*id.* at p. 130), which had been reiterated to all franchisees by notice dated October 16, 2012; *to wit*:

> Please be reminded that LUKOIL North America's payment terms for dealers who have been extended credit are that the EFT will occur on the third business day following the date of Bill of Lading (BOL). The date of BOL is the date that the load was lifted at the terminal. Please refer to www.lnallc.com for all EFT draft dates, and see below example:

| BOL Day | EFT Day |
|---|---|
| Monday | Thursday |
| Tuesday | Friday |
| Wednesday | Monday |
| Thursday | Tuesday |
| Friday | Wednesday |
| Saturday | Wednesday |
| Sunday | Wednesday |

Note: Bank holidays will not be counted as business days.[7]

Mr. Naggy testified that in accordance with this schedule, for example, any fuel delivered on Tuesday must be paid for by EFT on Friday. (Hrg. Tr. at pp. 130-32). He further testified that a business day under the policy is any 24-hour day, other than a weekend or holiday, not the "9-5 business day" espoused by Mr. Khan. (*Id.*). It is noted that neither the content of the letter nor the illustrative chart draws any distinction for fuel deliveries after 5:00 PM (or any particular time).

---

[7]     (Exhibit D-4, introduced during Hearing).

Mr. Naggy's testimony was corroborated by other documentation submitted during the hearing. In particular, Defendant offered a collection of bills of lading and invoices (Exhibit D-3) corresponding to fuel deliveries made to Plaintiff between December 21, 2012, and February 23, 2013. Each of the invoices, including the one corresponding to the February 19, 2013 fuel delivery, shows a "Due Date," three calendar days after the fuel delivery date, not counting the weekends or holidays, even when the delivery was made after 5:00 PM, *i.e.*, what Plaintiff described as "after business" hours. (*Id*.). For example, this particular exhibit shows that Plaintiff received a delivery of fuel on Tuesday, February 5, 2013, sometime after 9:49 PM, and had a "Due Date" of Friday, February 8, 2013. (*Id.* at pp. 5-6).

Plaintiff introduced evidence that supported Mr. Naggy's testimony; *i.e*., a document which listed EFT transactions from Plaintiff's account originating between January 9, 2013, and April 15, 2013. (Exhibit P-3). This document shows that for a delivery made "after business hours" on Tuesday, February 5, 2013, Plaintiff's EFT account was charged on Friday, February 8, 2013, three days later, similar to the transaction involving the Tuesday, February 19, 2013 delivery.[8]

As a result of its nonpayment for the February 19, 2013 delivery, Plaintiff was placed on "PRE-PAID" status on Monday, February 24, 2013. (Hrg. Tr. at pp. 38-39). This prepaid status required Plaintiff to pay for future fuel *prior to* its delivery. (*Id*. at p. 39). Notably, under the terms of the Franchise Agreement, Plaintiff was required to pay for fuel "prior to delivery," unless Defendant, "in its sole discretion," offered and agreed to other credit terms. (*See* ECF 47,

---

[8] Upon consideration of the evidence presented, this Court opines that Plaintiff was required to pay for fuel deliveries within three days of the delivery, regardless of whether the delivery was made "after business hours."

Ex. B, Franchise Agreement, at §§2.3 and 2.4). The Franchise Agreement also permitted Defendant to "revoke credit, at any time." (*Id*. at §2.4(a)).

At both the hearing and during his depositions, Mr. Khan conceded that Plaintiff did not pay for the fuel on Friday, February 22, 2013. (Hrg. Tr. at pp. 85-88, 92-95; ECF 47, Ex. C, pp. 134-35). Plaintiff further conceded that as of the date of the hearing, the money owed for the February 19, 2013 motor fuel delivery had still not been paid, nor had it paid for the motor fuel delivered on Saturday, February 22, 2013.[9] (*Id*.).

By two letters dated March 6, 2013, Plaintiff was notified it had a past due and unpaid balance of $71,008.21, and that it had failed to maintain an adequate inventory of motor fuel at the premises. (*See* ECF 9-2, Exs. B and C). Defendant demanded that Plaintiff immediately recommence its purchase of motor fuel from Defendant and market the fuel to the motoring public. (*Id*.). These letters again reminded Plaintiff that the PMPA permits the termination of the Franchise Agreement if Plaintiff failed to sell motor fuel at the Station for seven consecutive days.[10] (*Id*.).

By letter dated April 3, 2013, Defendant notified Plaintiff of the termination of the Franchise Agreement (the "Termination Letter"), explaining that (1) Plaintiff failed "to sell any gasoline at the [Premises] in the period from at least March 11, 2013 to present," and that (2) Plaintiff "abandoned the franchise, the franchise relationship and the Franchise Agreement." (ECF 47, Ex. C). The Termination Letter set forth the following purported breaches by Plaintiff:

(i)    intentionally not operat[ing] the Marketing Premises to be employed under the franchise in connection with sale or distribution of motor fuel, for a period of

---

[9]    During the hearing, Mr. Khan admitted that Plaintiff owed at least $40,000.00 for the two February fuel deliveries, after taking into consideration application of some or all of Plaintiff's $45,000.00 security deposit. (Hrg. Tr. at pp. 86-88)

[10]    By letter dated March 26, 2013, Defendant notified Plaintiff of additional defaults of the Franchise Agreement. (ECF 9-2, Ex. D).

seven (7) consecutive days, i.e., in the period at least March 11, 2013 to present, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(ii)     intentionally not operat[ing] the Marketing Premises to be employed under the franchise during operating hours required by the PMPA Franchise Agreement, and intentionally failed to keep the motor fuels business open and in normal operation for those periods;

(iii)    failed to use good faith and best efforts to maximize the sale of Products at the Marketing Premises as required by the PMPA Franchise Agreement; and

(iv)    failed to maintain an adequate inventory of motor fuel to serve the needs of the motoring public at the Marketing Premises.

In light of these breaches, Defendant concluded that these breaches required the termination of the Franchise Agreement effective on April 9, 2013. (*Id.*).

Plaintiff does not dispute that it failed to purchase motor fuel from Defendant, or that it remained closed without selling motor fuel for more than seven consecutive days. (Hrg. Tr. at p. 56). To the contrary, Mr. Khan admitted that the Station ran out of fuel and had not sold any fuel since March 2013. (*Id.* at p. 92; ECF 47, Ex. D, Khan Dep. at pp. 149-50). Mr. Khan further admitted that as of the date of the hearing, Plaintiff had still not paid for the two fuel deliveries previously described, and had not paid any rent due on the premises since February 2013. (Hrg. Tr. at pp. 86-88, 92-95; *see also* ECF 47, Ex. D, Khan Dep., at pp. 37, 57, 69, 149).

**LEGAL STANDARD**

Rule 56 governs the summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Rule 56(c) provides that the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  *Id*. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  *See* Rule 56(c)(1)(A-B).  The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  The non-moving party may not rely on bare assertions, conclusory allegations or suspicions, *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings.  *Celotex*, 477 U.S. at 324.  Rather, the non-moving party must "go beyond the pleadings" and either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*.

**DISCUSSION**

As stated, to overcome a motion for summary judgment, Plaintiff must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). To meet this burden, Rule 56 requires Plaintiff to provide citation to the factual record which shows the existence of a genuine dispute of material facts. Specifically, Rule 56(c) provides:

> A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited to do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

In addition, where a non-movant fails to oppose a motion for summary judgment with affidavits and other evidence, the court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990). In this regard, Rule 56(e) provides as follows:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

Here, Plaintiff makes little, if any, attempt to refute Defendant's facts or evidence with its own affidavits or evidence. While Plaintiff appears to generally contest the facts set forth in Defendant's motion, it does not cite to evidence of record, nor has it shown that the facts are genuinely disputed. Plaintiff asserts many facts in its opposition brief, but does not provide any citations to the factual record to support these contentions. Because Plaintiff has failed to refute Defendant's proffered evidence or the facts set forth in the factual background of Defendant's motion, this Court may, and will, construe Defendant's proffered facts as admitted. *See* Fed. R. Civ. P. 56(e)(2).[11] These facts establish that Defendant is entitled to summary judgment on both Plaintiff's claims and Defendant's counterclaim.[12]

### *Plaintiff's PMPA Claims*

As to Plaintiff's PMPA claims, the PMPA was enacted in 1978 to protect a franchisee's reasonable expectation of continuing a franchise relationship while at the same time ensuring that distributors have adequate flexibility to respond to changing market conditions and consumer preferences. *Patel v. Sun Company, Inc.,* 63 F.3d. 248 (3d Cir. 1995). The PMPA was

---

[11] In its response, Plaintiff seems to recognize the scarcity of the factual record to support its claims. (*See* Pl. Br. at p. 6 – "There can be no doubt that the discovery process failed to produce much of the relevant evidence which could have been presented in this matter."). Plaintiff attributes this scarcity to Defendant's purported obstruction during the discovery phase. For example, Plaintiff complains that when deposing Jacob Naggy, Lukoil's Manager of Retail Operations, Mr. Naggy "was very obstructive in the way he answered (or did not answer) questions throughout the deposition." (Plaintiff's Br. at p. 6). Plaintiff could have, and should have filed a motion to compel if discovery was being thwarted by Defendant. Moreover, Rule 56(c)(4) and (d) permit a non-movant, like Plaintiff, to submit affidavits or declarations to meet its summary judgment burden or to justify its inability to present facts or evidence. Plaintiff did not do so and accordingly, cannot be heard to complain of such at the summary judgment stage.

[12] As evidentiary support of its claims and/or to meet its summary judgment burden of showing a genuine issue of material fact, Plaintiff attaches only the deposition testimony transcript of Jacob Naggy. (*See* ECF 48). While Plaintiff attaches the entire transcript, he cites to only thirteen pages of the 77 page transcript. A review of these cited pages, however, shows that they fall well-short of refuting any of the undisputed facts cited (with evidence) by Defendant or showing the existence of a genuine issue of material fact. Indeed, most of the cited testimony relates to Plaintiff's untimely contention that Defendant and/or Mr. Naggy were obstructive during the discovery phase.

intended to mitigate the perceived disparity in bargaining power between franchisors and franchisees by protecting the latter from arbitrary or discriminatory terminations or non-renewals. *O'Shea v. Amoco Oil Co*., 886 F.2d 584, 587 (3d Cir. 1989); *Slatky v. Amoco Oil Co*., 830 F.2d 476, 484 (3d Cir. 1987). The PMPA attempts to alter this imbalance by (1) regulating the grounds and conditions for which distributors may terminate or refuse to renew a franchise and (2) by creating an exclusive cause of action for aggrieved franchisees to challenge such actions. *See* 15 U.S.C. §§2802(b)(1) and 2805; *Kehm Oil Co. v. Texaco, Inc*., 537 F.3d 290, 294 (3d Cir. 2008). The PMPA's primary goal is to provide protection to the franchisee. *Rodgers v. Sun Ref. & Mktg. Co.*, 772 F.2d 1154, 1158 (3d Cir. 1985). For "legitimate needs," however, a franchisor can terminate the franchise based upon one of the limited, enumerated grounds set forth in the statute. *Id*. (quoting *Sun Ref. & Mktg. Co. v. Rago,* 741 F.2d 670, 673 (3d Cir. 1984)); 15 U.S.C. §2802(b)(2).

Specifically, §2802(b)(2)(A) of the PMPA provides that a franchisor may terminate a franchise relationship if there is a "failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." The Act, however, does not define the terms "reasonable" or "material significance." Courts have interpreted these terms by keeping with the common and ordinary use and meanings of these terms; such as, contractual terms that are vital to the franchise agreement[13] or when the franchisee fails to comply with a franchise provision that is both conscionable and of real importance or great consequence to the franchise relationship.[14] The Third Circuit Court of Appeal's "materiality" test inquires whether the franchise agreement provision is a non-technical

---

[13]     *NSY, Inc. v. Sunoco, Inc.*, 218 F. Supp. 2d 708 (E.D. Pa. 2002) (citing *DiNapoli v. Exxon Corp*., 549 F. Supp 449 (D.N.J. 1982)).

[14]     *Id*. (citing *Doebereiner v. Sohio Oil Co*., 880 F.2d 329 (11th Cir. 1989)).

requirement and is a "significant substantive requirement relating to the way the franchisee must run his business." *O'Shea*, 886 F.2d at 595 n. 11. Termination under this subsection does not require that the franchisor provide the franchisee an opportunity to cure. *Id.* at 595.

The act also provides additional reasons to terminate a franchise. For instance, it can be terminated for a "failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise if the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions." 15 U.S.C. §2802(b)(2)(B). Termination under this provision is permissible without consideration as to the reasonableness of the contractual provision so long as the franchisee is given an opportunity to comply. *O'Shea*, 886 F.2d at 595.

A franchise can also be terminated if there is an "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. §2802(b)(2)(C). An "event" within the meaning of this subsection expressly includes, *inter alia*, "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled" and "failure by the franchisee to operate the marketing premises for 7 consecutive days." §2802(c)(8) and (9). A franchisee's failure to have fuel available for sale may be a basis for termination or nonrenewal under § 2802(b)(2)(C). *Rodgers*, 772 F.2d at 1157.

Here, in the termination notice, Defendant enumerated the reasons for terminating the Franchise Agreement; *to wit*: (i) Hillmen's failure to sell fuel at the station for at least 23 days (as of the date of the notice); (ii) Hillmen's failure to operate the station for seven consecutive days; (iii) Hillmen's failure to operate the station as required by the Franchise Agreement; and (iv) Hillmen's failure to maintain an adequate supply of motor fuel. (ECF 47, Ex. C). Clearly, these

reasons for termination fall well within the parameters of a lawful termination under the PMPA. It is hard to construe Plaintiff's admitted failure to sell gasoline for at least 23 days and its failure to operate the Station for seven (7) consecutive days as anything other than breaches of reasonable and material provisions of the Franchise Agreement.[15] Under the PMPA's express definitions, a franchisee's failure to sell gas for seven (7) consecutive days is deemed an "event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. §2802(c)(9)(A).

While Plaintiff concedes that it did not purchase or sell any gasoline for seven (7) consecutive days, and that its failure to do so "constituted a violation of the P.M.P.A. lease," Plaintiff argues that its admitted failures were "the fault of the franchisor," (*see* Pl. Br. at p. 6), and, therefore, do not constitute valid grounds for termination under the PMPA. Specifically, Plaintiff contends that the failure to pay for the delivered fuel and to operate the premises as required were caused by Defendant's purported wrongful conduct of increasing Plaintiff's (and other franchisee's) rent; increasing the cost of the petroleum to Plaintiff (and other franchisees) and thereby decreasing Plaintiff's (and other franchisee's) profit ratio; requiring Plaintiff (and other franchisees) to pay real estate taxes; making improper debits from Plaintiff's EFT account; and placing Plaintiff on "PRE-PAID" status.[16]

Plaintiff relies on §2801(13) of the PMPA which excludes from the definition of "failure" "(A) any failure which is only technical or unimportant to the franchise relationship; (B) any failure for a cause beyond the reasonable control of the franchisee . . . ." 15 U.S.C. §2801(13).

---

[15]     Pursuant to the terms of the Franchise Agreement, Plaintiff was required to "keep the Motor-Fuels Business open and in normal operation" 24 hours a day, seven days a week. (*See* Ex. B, Franchise Agreement, at §§9.3 and 9.4).

[16]     Notably, Plaintiff provides little if any evidence in its opposition brief to support its assertions as to any of these acts by Defendant.

This exclusion has been considered as "merely a legislated excuse for nonperformance," which reflects a judgment that "unforeseen circumstances may impede compliance" with certain, otherwise reasonable, franchise requirements. *Sun Ref.*, 741 F.2d at 673 (citing *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1224 n. 16 (7th Cir. 1982)). Courts that have addressed this "legislative excuse for nonperformance" issue have held that a franchisee's lack of funds to pay invoices, for whatever reason, cannot be characterized as a cause beyond the franchisee's reasonable control. *See e.g.*, *Gun Hill Rd. Serv. Station, Inc. v. Exxon Mobil Oil Corp.,* 2013 WL 395096, at *10 (S.D.N.Y. Feb. 1, 2013) (noting that "general economic hardship – a 'plain, ordinary failure to pay a debt for shortage of cash' – cannot excuse a failure under Section 2801(13)(B)."); *Cantrell v. Exxon Co. U.S.A.*, 574 F. Supp. 313, 317-18 (M.D. Tenn. 1983); *Talbert-Siebert Ent., Inc. v. Shell Oil Co.*, 1992 WL 119916, at *7 (M.D. La. May 8, 1992) ("As a matter of law, economically difficult times are not an excuse for failure by the franchisee to timely pay to the franchisor all sums to which the franchisor is legally entitled."); *ABJO Motors, Inc. v. Shell Oil Co.*, 856 F. Supp. 656, 658 (S.D. Fla. 1994) ("A franchisee's lack of funds to pay rent due, for whatever reason, simply cannot be characterized as a cause beyond the franchisee's reasonable control. To treat it as such would render Section 2802(c)(8) meaningless."); *Cal. Petroleum Distibs. Inc. v. Chevron U.S.A. Inc.*, 589 F. Supp. 282 (E.D.N.Y. 1984) (finding that the PMPA specifically provided that nonpayment is a violation of the franchise agreement and grounds for termination destroys any contention that nonpayment should be construed as matter beyond the franchisee's control.")

Plaintiff argues that its admitted "failures" fall within the statutory exclusion because they were allegedly caused by Defendant's wrongful acts. As stated, Plaintiff contends that its "failures" were caused by (1) Defendant's increase in rents, cessation of maintenance stipends

and addition of real estate taxes; (2) and Defendant's improper debits from Plaintiff's EFT account, which in turn, resulted in Plaintiff's placement in "PRE-PAID" status.

The Court finds that based upon the evidence presented, no reasonable factfinder could find that these occurrences excuse Plaintiff's failure to pay for the delivered fuel or operate the premises. Plaintiff presents no evidence to establish that Defendant's purported increase in rent and cessation of stipends was unlawful or outside the scope of Defendant's allowable business discretion. Moreover, despite receiving notices from Defendant in 2012 that Plaintiff would no longer receive the maintenance stipend and that it would be required to pay property taxes, Plaintiff admittedly renewed the Franchise Agreement on November 2012, months prior to its effective date of February 1, 2013. The renewed Franchise Agreement included these modifications and the increased rent provisions. (*See* Ex. B, Lease at §§2.1, 2.2 and 3.1). As such, Plaintiff cannot rely upon these contractual modifications, to which it agreed, to justify or excuse its failure to pay for the delivered fuel or to operate the Station.

Although during the hearing on Plaintiff's motion for a preliminary injunction,[17] Plaintiff focused on the EFT transaction pertaining to the Tuesday, February 19, 2013 fuel delivery as a reason for his default, as stated, this Court finds Defendant's proffered interpretation of its EFT credit policy to be the only reasonable interpretation, consistent with both the description of the policy outlined in the October 16, 2012 letter (Exhibit D-4) and the parties' past practices. What is more compelling is Plaintiff's admission that as of the date of the hearing, it had still not paid for the fuel deliveries at issue, nor did it have the means to make any payment toward the debt. In light of this undisputed evidence, this Court finds that no reasonable factfinder could conclude that the failures cited in Defendant's April 3, 2013 termination letter were attributable to "a cause

---

[17] As noted, inexplicably, Plaintiff does not cite this evidence, or any other evidence presented during the hearing on Plaintiff's motion for a preliminary injunction.

beyond the reasonable control of the franchisee." Accordingly, summary judgment is entered in favor of Defendant on Plaintiff's PMPA claims.

*Preemption*

Defendant argues that Plaintiff's remaining state law claims for breach of contract, violation of the UCC, and fraud are preempted by the PMPA. As with many of Defendant's arguments, Plaintiff provides no response. Section 2806(a)(1) of the PMPA provides:

> To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (of the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

In *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290 (3d Cir. 2008), the Third Circuit held that a district court must apply the "intimately intertwined" test to determine whether a plaintiff's claims are preempted by this section of the PMPA. *Id.* at 299. Under this test, state law claims are preempted by the PMPA if they are "intimately intertwined" with the termination or nonrenewal of a franchise. *Id.*

Here, without the benefit of any response to Defendant's preemption argument, it is difficult to determine from either Plaintiff's complaint or its briefs whether its breach of contract and fraud claims are premised on the alleged wrongful termination of the Franchise Agreement. To the extent Plaintiff's breach of contract and fraud claims are premised on Defendant's alleged wrongful termination of the Franchise Agreement, such claims are clearly "intimately

intertwined" with the alleged wrongful termination of the Franchise Agreement and, thus, are preempted by the PMPA. *Cf. Siecko v. Amerada Hess Corp*., 569 F. Supp. 768, 772 (E.D. Pa. 1983) (holding that plaintiff's breach of fiduciary duty claim was preempted by PMPA); *Shukla v. BP Exploration & Oil, Inc*., 115 F.3d 849 (11th Cir. 1997) (holding that plaintiff's fraud claim was preempted by PMPA); *Continental Enters., Inc. v. American Oil Co.*, 808 F.2d 24 (8th Cir. 1986) (holding plaintiff's breach of contract claim was preempted by the PMPA because it was premised on termination of the franchise agreement); *D&T Oak Creek Station, Inc. v. True N. Energy, LLC*, 2011 WL 4543922, at *6 (S.D. Ohio Sept. 29, 2011) (same).

As alleged in the complaint, Plaintiff's UCC claim is premised upon Defendant's alleged improper setting of the wholesale price of petroleum products in violation of §2305 of the UCC. Because this claim does not appear to be premised on termination of the Franchise Agreement, it is not preempted by the PMPA.

### Plaintiff's Breach of Contract and Fraud Claims

To the extent any components of Plaintiff's breach of contract or fraud claims are not premised on the alleged wrongful termination of the Franchise Agreement and, thus, not preempted by the PMPA, such claims are dismissed based on Plaintiff's failure to support them with evidence sufficient to meet its summary judgment burden under Rule 56.

In its motion for summary judgment, Defendant argues that Plaintiff has failed to present evidence sufficient to establish either a breach of the parties' Franchise Agreement by Defendant or any of the requisites for fraud. In its opposition, Plaintiff offers no response to either Defendant's arguments or the facts and evidence presented and, therefore, has failed to carry its

summary judgment burden as to these claims. Accordingly, Defendant's motion for summary judgment as to Plaintiff's breach of contract and fraud claims is granted.[18]

### *Plaintiff's UCC Claim*

Plaintiff also asserts a claim under §2305 of the UCC premised upon Defendant's purported exhibition of "the utmost bad faith in dealing with Plaintiff franchisee in that it intentionally set the wholesale price of motor fuels and related products in a manner that doomed the Plaintiff's ability to remain profitable in his business." (Comp. at ¶42). Section 2305 of the UCC permits an open price term in a contract for the sale of goods. It provides as follows:

> (a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if: (1) nothing is said as to price; (2) the price is left to be agreed by the parties and they fail to agree; or (3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency that is not so set or recorded. (b) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

---

[18] As discussed above, Defendant has presented unrefuted evidence that Plaintiff breached the Franchise Agreement by, *inter alia*, failing to pay for delivered fuel, rent, and real estate taxes, and failing to operate the gas station for seven (7) consecutive days. (*See* Ex. D, Khan Dep. at pp. 37-38, 57, 69, 134-35, 143-45, 148-49; Ex. E, Khan Dep. at p. 63). In light of this undisputed evidence, and the lack of any evidence showing a breach by Defendant, Plaintiff's breach of contract claim is wholly without merit.

In its motion, Defendant argues that Plaintiff's fraud claim must be dismissed because Plaintiff failed to present evidence to satisfy each of the elements of the claim and because the claim is barred by the gist of the action doctrine. As discussed above, Plaintiff presents little by way of evidence to support any of its claims. This is equally true with regard to Plaintiff's fraud claim. As such, Plaintiff has failed to meet its summary judgment burden as to this claim.

In addition, Pennsylvania courts, including district courts applying Pennsylvania law, have repeatedly held that where the parties' relationship is governed by a contract, tort claims are barred by the gist of the action doctrine. *See, e.g.*, *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002); *Slavko Props., Inc. v. T.D. Bank, N.A.*, 2015 WL 1874233, at *14 (E.D. Pa. Apr. 24, 2015); *Quorum Health Resources, Inc. v. Carbon-Schuylkill Cmty. Hosp., Inc.*, 49 F. Supp. 2d 430, 432 (E.D. Pa. 1999); *Strausser v. Pramco III*, 944 A.2d 761, 767 (Pa. Super. 2008) (holding that a fraud claim was properly dismissed by the "gist of the action" doctrine); *Etoll v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 20-21 (Pa. Super. 2002); *Phico Ins. Co. v. Presbyterian Med. Servs. Corp.*, 663 A.2d 753, 757-58 (Pa. Super. 1995). Here, the gist of Plaintiff's action against Defendant is premised on the rights and responsibilities of the parties as set forth in the Franchise Agreement. As such, Plaintiff's tort claims are barred by the gist of the action doctrine.

13 Pa. C.S.A. §2305. Under this provision, in the absence of an agreed upon price, the price must be fixed in good faith. *See Callahan v. Sunoco, Inc.*, 2005 WL 994615, at *2 (E.D. Pa. Apr. 28, 2005).

Rather than support its claim with citations to record evidence (as required by Rule 56), Plaintiff merely repeats the bald allegations contained in its complaint. Plaintiff has presented no evidence that Defendant's purported increase in the wholesale price of fuel was undertaken in bad faith. Moreover, Plaintiff does not dispute, nor can it, that its relationship with Defendant was governed by the parties' written Franchise Agreement. Thus, pursuant to the Franchise Agreement, Plaintiff was required to pay Defendant the price that was in effect at the time and place of delivery for motor fuel products sold and delivered to the station. (Ex. B, Franchise Agreement at §2.2). Defendant had no obligation to set the price in a manner that somehow ensured that Plaintiff made a profit. *See e.g.*, *Callahan*, 2005 WL 994615, at *5 ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance."); *T.A.M., Inc. v. Gulf Oil Corp.*, 553 F. Supp. 499, 509 (E.D. Pa. 1982) ("It is safe therefore, to conclude that the open price term, in addition to being necessary to accommodate a fluctuating market, was also acceded to by plaintiffs."); *Casserlie v. Shell Oil Co.*, 902 N.E.2d 1, 6 (Ohio 2009) (holding that defendant was not required to sell gasoline that is "profitable for buyers").

To the extent Plaintiff relies upon Defendant's purported increase in rent, elimination of a monthly maintenance stipend, or addition of real estate taxes to establish Defendant's bad faith under §2305, such reliance is unsupported and misplaced. The Franchise Agreement, and attached lease, expressly permitted Defendant to raise the rent and charge back the cost of the real estate taxes to Plaintiff. (*See* ECF 47, Ex. B, Lease at §§2.1, 2.2 and 3.1). In fact, Plaintiff

admittedly renewed the Franchise Agreement after being advised that it would no longer receive the maintenance stipend and that it would be required to pay property taxes. As such, Plaintiff cannot rely upon these contractual modifications, to which it agreed, to justify or excuse its failure to pay for the delivered fuel or to operate the station or to establish bad faith on the part of Defendant. Plaintiff also provides no legal support for its contention that a franchisor violates the UCC, the PMPA or an underlying franchise agreement by increasing the cost of fuel, raising the rent or requiring a franchisee to pay applicable real estate taxes where the agreement expressly permits such increases. Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's UCC claim.

### Defendant's Counterclaim for Breach of Contract

Defendant seeks summary judgment on its counterclaim for breach of contract against Plaintiff.[19] Defendant has alleged that Plaintiff breached the parties' Franchise Agreement by failing to pay the amounts due for rent and for the petroleum delivered to Plaintiff under the Franchise Agreement. Plaintiff offers no argument in response to Defendant's contentions.

To establish a claim for breach of contract, a party must establish (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Corestates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999). As set forth above, it is undisputed that Plaintiff and Defendant entered into a contract, *i.e.*, the Franchise Agreement. It is also undisputed that Hillmen failed to pay Defendant rent and for delivered motor fuel owed under the Franchise Agreement. As such, there is no genuine issue of material fact as to whether Hillmen breached the Franchise Agreement. Accordingly, summary judgment is entered in favor of Lukoil on its counterclaim for breach of contract.

---

[19]     Defendant moves for summary judgment on its counterclaim only as to liability, and not damages.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is granted. An Order consistent with this Memorandum Opinion follows.

*Nitza I. Quiñones Alejandro,* USDC, J